Fred M. Archer and Evie B. Archer v. Commissioner. Fred M. Archer v. Commissioner.
Archer v. Commissioner
Docket Nos. 31817, 36574.
United States Tax Court
1954 Tax Ct. Memo LEXIS 296; 13 T.C.M. (CCH) 159; T.C.M. (RIA) 54057; February 18, 1954
*296 No books or records having been maintained by which the income of petitioners could be calculated, it was determined by the respondent by use of the net-worth method. Such determination resulted in the assessment of substantial deficiencies in income tax for 1942, 1943, 1944, and 1945. Penalties for fraud and underestimate of petitioners' estimated tax were also imposed. 1. Held, respondent's net-worth computations are incorrect in certain respects. The correct amounts of the deficiencies are determined. 2. Held, further, petitioners' understatement of their income for four successive years was made with fraudulent intent to evade the payment of taxes. 3. Held, further, penalty for substantial underestimate of petitioners' 1945 estimated tax is sustained. Ewell G. Moore, Jr., Esq., and Edward A. White, Esq., for the petitioners. R. V. Bradbury, Jr., Esq., for the respondent. RICE
Memorandum Findings of Fact and Opinion These consolidated proceedings involve deficiencies in income tax and penalties asserted against Fred M. Archer for 1942 and 1943 and against Fred M. Archer and his wife, Evie B. Archer, for 1944 and 1945, as follows: Docket
50%
6%
No.
Year
Deficiency
Penalty
Penalty
36574
1942
$ 1,773.50
$ 886.75
36574
1943
4,689.23
2,344.62
31817
1944
5,452.23
2,726.12
31817
1945
5,281.79
2,640.89
$ 311.63
*297 The issues to be determined are: (1) was the net taxable income of Fred M. Archer understated in his income tax returns for 1942 and 1943, and was it understated in the joint returns of Fred M. Archer and Evie B. Archer for 1944 and 1945; (2) if so, are petitioners liable for the 50 per cent fraud penalty for such years, as prescribed by section 293 (b) of the Internal Revenue Code; and (3) are petitioners liable for the 6 per cent penalty for understatement of their estimated tax as prescribed by section 294 (d) (2) of the Internal Revenue Code. Some of the facts were stipulated. Findings of Fact The stipulated facts are so found and are incorporated herein. During the years 1941 through 1945, Fred M. Archer (hereinafter referred to as the petitioner) and Evie B. Archer were husband and wife, residing in Carrollton, Georgia. Petitioner filed individual tax returns for 1942 and 1943 and joint returns for himself and his wife for 1944 and 1945 with the collector of internal revenue for the district of Georgia. Petitioner supported himself and his family since 1925 by engaging in a variety of activities, many of them concurrently. *298 These included farming and the ownership of tenant farms; dealing in used cars, trucks, and auto junk; the operation of a trucking business; trading in mules; and the sale of illegal whisky. Numerous cases were instituted against the petitioner for this last activity from the early 1930s to June 1944. He was frequently fined and served two prison terms, one of 60 days in 1937 and another of 6 months in 1940. During the taxable years, petitioner's principle occupation was that of a used-car dealer, operating under his own name and under the trade name of Archer Motor Company. In addition, during this period, he operated farms with tenants on "halves"; dealt in auto junk; and, until July 1944, sold illegal whisky. During 1943 and 1944, petitioner's son, Robert, was a soldier stationed in various army camps in the United States. Robert Archer bought and sold cars for the petitioner, and the profits were divided between them. Petitioner's other son, Harold, received a portion of the profits of certain sales in return for delivering the cars to their destinations. No books or records were kept to reflect petitioner's income in these years, or, by which his income could be determined. *299 He filed his first Federal income tax return for the year 1942. Petitioner's net income as reported by him on his returns for 1942 and 1943, and, as reported jointly with his wife on their returns for 1944 and 1945, together with respondent's determination of their income for these years, is as follows: Taxable
Taxable
Net Income
Net Income
As Reported
as Determined
Year
by Petitioners
by Respondent
1942
$ 1,776.19
$ 9,140.55
1943
1,139.66 *
15,704.86
1944
1,155.43
17,023.78
1945
1,141.32 **
16,213.57
* Victory tax net income of $ 1,356.25 reported for 1943: respondent determined this to be $ 15,729.86. ** This figure is adjusted gross income. The record does not disclose the amount reported as petitioners' taxable net income for this year. Respondent's determination of petitioners' net income was calculated by use of the networth method. It was based upon the following stipulation of the net worth and personal expenditures of the petitioners for the years ending December 31, 1941, 1942, 1943, 1944, and 1945. ASSETS
12/31/41
12/31/42
12/31/43
12/31/44
12/31/45
Cash in bank
$ 990.85
$ 2,380.62
$ 2,667.68
$ 2,677.95
$ .00
Archer Motor Co., By F. M.
Archer - bank account
7,896.27
5,671.90
Notes Receivable
154.00
3,868.44
9,482.11
Real Estate Holdings
11,100.00
11,100.00
15,425.00
28,275.00
42,851.67
Cash &/or cars on hand
2,500.00
15,000.00
10,000.00
5,000.00
Farm Equipment
50.00
1,275.00
1,275.00
1,975.00
2,900.00
Carrollton Auto Parts Co.,
Investment in
7,000.00
Personal Effects
3,000.00
3,000.00
3,000.00
3,000.00
3,000.00
Total Assets
$ 15,140.85
$ 20,255.62
$ 37,521.68
$ 57,692.66
$ 75,905.68
LIABILITIES
Loans - Peoples Bank
$ 12,500.00
Mortgages Payable
$ 5,614.48
$ 1,337.50
$ 1,460.00
$ 2,500.00
.00
Robert Archer - open account
2,500.00
6,000.00
7,000.00 .00
Total Liabilities
$ 5,614.48
$ 3,837.50
$ 7,460.00
$ 9,500.00
$ 12,500.00
NET WORTH
$ 9,526.37
$ 16,418.12
$ 30,061.68
$ 48,192.66
$ 63,405.68
However, the petitioners reserved the right to show by competent evidence that the net worth, as stipulated, should have included additional assets at the close of any of the five years stipulated for and that the amounts stipulated as "Living and personal expenditures" for those years were overstated. The respondent determined the net income of petitioners for the years here involved, using the stipulated net-worth amounts set forth above, as follows: 12/31/42
12/31/43
12/31/44
12/31/45
Net Worth
$ 16,418.12
$ 30,061.68
$ 48,192.66
$ 63,405.68
Less - Prior year net worth
9,526.37
16,418.12
30,061.68
48,192.66
Increase - Net worth
6,891.75
13,643.56
18,130.98
15,213.02
Less - Net life insurance received
- 3,200.00
Less - Capital gains
- 861.18
Less - Depreciation
- 126.20
- 313.70
- 446.20
- 638.27
Less - Contributions
- 25.00
- 25.00
- 61.00
Less - Standard Deduction
- 500.00
Living & personal expenditures
2,400.00
2,400.00
2,600.00
3,000.00
Correct net income
$ 9,140.55
$ 15,704.86
$ 17,023.78
$ 16,213.57
The stipulated statement of the assets comprising petitioner's net worth at December 31, 1941, does not include any cars held by petitioner for sale in his used-car business; notes receivable arising out of the sale of cars by petitioner; junk held by petitioner for sale; mules, cattle, and hogs on petitioner's farms; cotton stored in a public warehouse; nor cash on hand. Petitioner signed this stipulation, on the advice of his attorney and respondent's counsel, for the purpose of limiting the issues to be raised during the hearing. It was his intention to introduce evidence at the hearing, under the power reserved by him in the stipulation, which would show that his net worth at December 31, 1941, was substantially in excess of that stated in the stipulation, due to the omission of the above-specified items. The stipulated schedule of petitioner's net worth for the years in issue is found to be incorrect in various particulars hereinafter specified. Petitioner held used cars for sale having a value of $ 3,500 at December 31, 1941. He also had $ 3,500 in notes receivable at this date. The only records he kept of the notes receivable arising out of the financing of his used-car sales were the notes themselves. He would enter the amount of each payment on the reverse side of the note, and, when fully paid, would return the note to its maker. In 1950, he still held notes with a face value of $ 1,876.22 which had been issued to him prior to December 31, 1941. The makers had made part payments on such notes, but defaulted on the balance; and petitioner considered them to be worthless. Included among the above $ 3,500 in notes receivable at December 31, 1941, is one issued by James B. Reagin with a $ 500 balance at that date and another issued by petitioner's brother, L. M. Archer, also with a $ 500 balance at December 31, 1941. The Reagin note was paid up in 1942, and the L. M. Archer note was satisfied in 1944 or 1945. Petitioner's real estate holdings at December 31, 1941, 1942, 1943, and 1944 should be increased by $ 1,580 since the stipulated cost of a certain 83 1/4-acre tract acquired by the petitioner in 1930 fails to include the $ 1,580 balance of the mortgage thereon, which the petitioner assumed at the time of acquisition. This mortgage is listed among the petitioner's liabilities at December 31, 1941, with a balance of $ 819.48 at that date. It was paid off in 1942. The petitioner disposed of this property in 1945 for $ 2,500; and, after deducting depreciation for prior years, he realized a capital loss of $ 541.15 in 1945. The schedule of petitioner's real estate holdings lists a parcel, denominated 45.75 acres and 55 acres, as acquired on January 1, 1945. Actually, the 45.75-acre parcel was owned by the petitioner during 1941 and the 55-acre parcel during 1942. They were sold to C. W. Marlow in 1944 and reacquired by the petitioner on January 1, 1945, for $ 1,900. The schedule of mortgages payable lists a balance due on a mortgage on the 45.75-acre parcel for the years ending 1941, 1942, and 1943. The value of petitioner's interests in the 45.75-acre parcel and the 55-acre parcel is $ 855 and $ 1,045, respectively, calculated according to the $ 1,900 selling price for both combined in 1945. Petitioner owned and operated a junk yard in conjunction with his used-car business; and its value, including the various tools and equipment thereon, was $ 1,000 at December 31, 1941. It was allowed to run down gradually until in 1945 the shop equipment and remaining junk were sold as a unit for $ 500. Petitioner had in storage in a public warehouse at the end of each of the calendar years 1941-1945 the following amounts of cotton: No. Bales
Value
December 31, 1941
35
$ 3,500
December 31, 1942
35
3,850
December 31, 1943
34
3,440
December 31, 1944
43
4,300
December 31, 1945
25
2,952
Petitioner purchased a new tractor on March 1, 1941, for $ 1,200 in cash. He subsequently exchanged this tractor, during 1941, for a Ford tractor and $ 700 boot. The value of the Ford tractor which he acquired was $ 500. Petitioner disposed of this Ford tractor in 1945. Petitioner owned 4 mules having a total value of $ 800 at December 31, 1941. He also had $ 500 in cash at this date. A corrected statement of petitioner's net worth as at December 31, 1941, 1942, 1943, 1944, and 1945 is as follows: Statement of Net Worth - F. M. Archer
ASSETS
12/31/41
12/31/42
12/31/43
12/31/44
12/31/45
Cash in Bank
$ 990.85
$ 2,380.62
$ 2,667.68
$ 2,677.95
Archer Motor Co. By F. M.
Archer - Bank Account
7,896.27
$ 5,671.90
Notes Receivable
3,500.00
500.00
654.00
3,868.44
9,482.11
Real Estate Holdings
13,535.00
14,580.00
18,905.00
29,855.00
42,851.67
Cash and/or Cars on Hand
4,000.00
2,500.00
15,000.00
10,000.00
5,000.00
Farm Equipment & Mules
850.00
1,275.00
1,275.00
1,975.00
2,900.00
Carrollton Auto Parts Co.,
Investment in
7,000.00
Personal Effects
3,000.00
3,000.00
3,000.00
3,000.00
3,000.00
Junk Yard
1,000.00
875.00
750.00
625.00
Cotton in Warehouse
3,500.00
3,850.00
3,440.00
4,300.00
2,952.00
Ford Tractor
500.00
500.00
500.00
500.00
Total Assets
$ 30,875.85
$ 29,460.62
$ 46,191.68
$ 64,697.66
$ 78,857.68
LIABILITIES
Loans - Peoples Bank
$ 12,500.00
Mortgages Payable
$ 5,614.48
$ 1,337.50
$ 1,460.00
$ 2,500.00
Robert Archer - Open Account
2,500.00
6,000.00
7,000.00
Total Liabilities
$ 5,614.48
$ 3,837.50
$ 7,460.00
$ 9,500.00
$ 12,500.00
NET WORTH
$ 25,261.37
$ 25,623.12
$ 38,731.68
$ 55,197.66
$ 66,357.68
Petitioner and his family lived frugally on his farm during the years in issue, growing much of their own food and spending little for clothing. A reasonable estimate of petitioners' living and personal expenses for each of these years is $ 2,000, including the life insurance premiums of approximately $ 400 per year which they paid. This also includes the various fines petitioner paid for his illegal whisky activities, such fines ranging from $ 50 to $ 250. On the death of his son, Harold, in 1944, petitioner received during that year the proceeds of various insurance policies totaling $ 4,240. Petitioner owned throughout the years in issue various farming equipment, farm animals, a garage, and a note issued by H. S. Archer in the amount of $ 3,500. These assets are not included in either the respondent's or our corrected statements of petitioner's net worth for these years. The correct taxable net income of the petitioners for the taxable years 1942 to 1945, inclusive, is in the respective amounts of $ 2,210.55, $ 14,769.86, $ 13,718.78, and $ 12,450.58 as reflected by the following corrected schedule of petitioner's net worth and income for these years: 12/31/41
12/31/42
12/31/43
12/31/44
12/31/45
Net Worth
$ 25,261.37
$ 25,623.12
$ 38,731.68
$ 55,197.66
$ 66,357.68
Less: Prior Years' Net Worth
25,261.37
25,623.12
38,731.68
55,197.66
Increase - Net Worth
361.75
13,108.56
16,465.98
11,160.02
Less: Net Life Insurance Received
-4,240.00
Less: Capital Gains
-71.17
Less: Depreciation
-126.20
-313.70
-446.20
-638.27
Less: Contributions
-25.00
-25.00
-61.00
Plus: Living & Personal Expenditures
+2,000.00
+2,000.00
+2,000.00
+2,000.00
NET INCOME
$ 2,210.55
$ 14,769.86
$ 13,718.78
$ 12,450.58
Petitioner's return for 1942 was prepared by his sister, and the returns for 1943, 1944, and 1945 were prepared by one Arthur Roberts, an attorney, from information furnished by petitioner. Since no books or records were maintained from which petitioner's income could be determined, the person preparing the returns relied entirely on an estimate which petitioner furnished of his income from his various activities. Thus, an estimate of petitioner's gross profit from all activities except the operation of his farm was reported as "Salaries and other compensation for personal services" on his 1942 return, and as "Total receipts" from business or profession on the 1943 and 1944 returns. However, income from rents and royalties was separately reported on his 1943 and 1944 returns. No computations were submitted for these years showing the cost of goods sold. On his return for 1945, petitioner reported total receipts of $ 22,560 and cost of goods sold, consisting of used cars and parts, as $ 19,229. However, records of petitioner's Archer Motor Co. bank account show gross deposits of $ 122,512.85 during 1945. Petitioner was a partner in the Carrollton Auto Parts Company during 1945. This partnership was engaged in the sale of used cars and automobile parts. No formal partnership agreements were entered into by the partners. The partnership filed no income tax return for 1945, and petitioner reported no income from this venture on his return for that year. Petitioner acquired the Blue and White Service Station in August 1945, and it was operated for several months in conjunction with the Carrollton Auto Parts Company. He leased part of it to the Rural Electrification Group and received a rental of $ 45 per month from August through December of 1945. No income was reported from either activity on his 1945 return. Petitioner purchased certain porperty from one C. C. Chance in October 1943 and rented it during the balance of the years in issue, receiving $ 30 per month in 1945. No rental income from this property was reported on petitioner's returns for 1943, 1944, or 1945. Petitioner purchased a house on Austin Avenue in Carrollton, Georgia, in May 1945. He rented it thereafter at the rate of $ 30 per month, but failed to report this income on his 1945 return. Petitioner reported gross rental income totaling $ 384 from five other properties in 1945. After the deduction of depreciation and expenses, he reported a net income of $ 99.30 from these five properties. During the years 1942, 1943, 1944, and 1945, petitioner was charging and collecting interest on automobile and real estate loans at the rate of 6 and 8 per cent. He reported income of $ 102 from dividends and interest on his 1945 return. Petitioner took deductions for interest expense of $ 25 in 1942, $ 120 in 1943, $ 304.25 in 1944, and $ 150 in 1945. From 1935 to 1943, petitioner kept all his property in his wife's name in order to avoid paying the claims of two women who had been injured in an automobile accident in which he was involved. He maintained no bank account in his own name during these years. All real and personal property owned by the petitioners on January 1, 1941, and January 1, 1942, was located in Carroll County, Georgia. The records of the Tax Commissioner of Carroll County, Georgia, disclose that separate "White Tax Payer's Returns Of Property For Taxation" were filed by each of the petitioners for the year 1941, as of January 1st. The total valuation of all personal property reported by both petitioners was $ 875, and their real property was valued at an aggregate of $ 4,350. The records disclose that the petitioners did not either individually or jointly file such returns for the year 1942. In consequence, the Board of Equalizers for Carroll County, Georgia, filed separate returns in their names for that year based on the separate returns filed by them for the year 1941. Petitioner signed the name of his wife, Evie B. Archer, to the joint income tax returns which he filed for himself and his wife for the years 1944 and 1945. The respondent was justified in determining the petitioners' taxable net income for the years before the Court by the net-worth method. The petitioners substantially understated their taxable net income in their returns for each of the years before the Court. Such returns were false and fraudulent and were filed with willful intent to evade the payment of taxes. Opinion RICE, Judge: We must decide whether respondent is correct in his determination of substantial deficiencies in petitioner's individual income taxes for the years 1942 and 1943 and in the joint taxes of petitioner and his wife for the years 1944 and 1945; and whether such deficiencies are due to a fraudulent intent to evade the payment of taxes. Since no books or records were kept from which the petitioners' income could be accurately determined, the respondent reconstructed their income for the years in issue by the use of the net-worth method. Though the result is, of necessity, but an approximation of their income for these years, it is clearly justified when a taxpayer is unable to substantiate his reported income by adequate books and records, and no more accurate method is available. Harris v. Commissioner, 174 Fed. (2d) 70 (C.A. 4, 1949). The petitioners contest the accuracy of the stipulated net worth and income determinations in many respects, under the rights reserved by them in the stipulation. Their principal defense to the substantial deficiencies asserted is that the net-worth schedules understate their total assets at the starting point, December 31, 1941, and, consequently, overstate the increase in their net worth and, thus, their income for the subsequent years. They also contend that respondent overstated their income by reason of his failure to take into account the full amount of nontaxable insurance proceeds received, and, also, by reason of the overstatement of their living expenses for the period. It is axiomatic that respondent's determination of deficiencies is presumptively correct and petitioners have the burden of proving error in such determination. This Court has noted its reluctance "to decide cases on the basis of burden of proof. Nevertheless, in the interest of the orderly presentation and disposition of cases, rules relating to the burden of proof have been formulated and of necessity must be followed." Estate of J. W. Gibbs, Sr., 21 T.C. 443 (promulgated January 6, 1954). The difficult problem of proof besetting the instant petitioners because of their failure to maintain books and records is one entirely of their own making. Unfortunately, the nature of much of petitioner's testimony and that of his witnesses and deponents was nebulous and unsubstantial, being based more upon speculation and estimate than upon facts and evidence. Most of the events and circumstances sought to be described had transpired more than 10 years previously and much of the evidence consists of the product of hazy memories rather than documentary proof of facts and figures. Petitioner's testimony as to the prices paid for various assets, when they were liquidated, and the period of time they were held was, in general, a muddled series of vague recollections, unsupported by corroborating evidence. We have found that petitioner owned various assets during the years in issue, such as cattle, hogs, and farm equipment, which were not included in the net-worth schedules. No substantial proof was introduced as to significant changes in the amounts of such assets held during these years and we must, therefore, assume that they remained constant. They, therefore, need not be introduced into the net-worth schedules, since the only meaningful items in these schedules are those which reflect changes in net worth. However, we have made various adjustments in the stipulated statement of net worth where we feel the evidence establishes inaccuracies and provides a basis for arriving at a reasonable approximation of the correct amount. Thus, although the evidence clearly indicates that petitioner was engaged in the used-car business in 1941, the stipulated net-worth statement allows him no inventory of cars on hand at December 31, 1941. The testimony was confusing on this point, with great disparity in the various estimates. No documentary evidence was offered, and we have had to rely on the hazy recollections of deponents as to the amount of cars they saw on petitioner's used-car lot during the latter part of 1941. Petitioner himself offered conflicting testimony on this point, at one point stating that he had $ 5,000 in used cars at the end of 1941 and, in a subsequent deposition, claiming that his stock at that date should be valued at $ 15,000 to $ 20,000.Testimony of another deponent was that petitioner possessed a used-car stock worth $ 20,000 to $ 25,000 during 1941. The evidence convinces us that petitioner did have a used-car stock at the starting date of the net-worth schedules, but it is, indeed difficult to determine even the approximate amount. Petitioner did not contest the stipulated amount of $ 2,500 which represents cash and/or cars on hand at the end of the following year. He testified that his stock of cars at December 31, 1942, had declined almost 50 per cent from his stock at the end of the previous year. We, therefore, consider that $ 3,500 is a reasonable estimate of his final inventory of used cars in 1941. He also contends that his income for 1945 is overstated by the $ 5,000 amount which the net-worth schedule allocates to cash and/or cars on hand at the end of 1945. Even were we to accept his uncorroborated testimony and that he had no cars at that date, we could make no change in this item because the record does not disclose whether this item, as originally agreed to by the parties, represented cash or cars, or a combination of both. We recognize that petitioner must have had various notes receivable at December 31, 1941, since he, himself, financed many of the used cars which he sold on credit. At one point he claimed that these aggregated $ 7,500, but he subsequently declared that there were "About 5 or 6 thousand dollars, there is no way of telling, I never did check up on what I had or nothing." The record discloses that petitioner did have two specific notes of $ 500 each and also various other notes totaling $ 1,876.22, which were never fully paid. This large amount of notes on which partial defaults were incurred indicates that petitioner must have had other notes which were fully collected and returned to their makers. Here again, in the absence of specific evidence, our finding of fact as to the total amount of notes possessed at December 31, 1941, must of necessity be an estimate, but we feel that $ 3,500 is a reasonable allowance for this item. The evidence as to petitioner's real estate dealings consists of oral testimony supported by deeds and the stipulated schedule of petitioner's mortgage liabilities. Based on these, we have made various changes in the stipulated statement of petitioner's net worth, as already outlined in our findings of fact. Our finding as to the value of petitioner's junk yard is based on the testimony of petitioner and various deponents. We have assumed that its value decreased an equal amount during each of the years from 1941 until its sale in 1945. We have based our determination as to the amount of cotton the petitioner had stored in a public warehouse at the end of 1943, 1944, and 1945 on the amounts he reported on his income tax returns for those years. There was no substantial evidence indicating that these amounts were incorrect. However, petitioner's 1942 return gives no breakdown of his farm income; and we have, therefore, relied on his testimony and that of the warehousemen that he had approximately 35 bales at the end of 1942 and also at December 31, 1941. Since these amounts are not out of line with the amounts petitioner reported on his returns for subsequent years, we have accepted them for the purpose of the net-worth computation. We have accepted the valuation petitioner reported on his returns for the price of cotton per pound in 1943, 1944, and 1945, and have based our 1941 and 1942 valuations on the testimony of the warehouseman. Petitioner claims that he possessed 9 mules, worth $ 2,000, at December 31, 1941. Allegedly he acquired them during that year and held them until 1945 and 1946. One witness testified that he had sold 2 mules to the petitioner in the Spring of 1941; and another witness, who had been one of petitioner's tenant farmers, averred that petitioner had 9 mules on four different farms during this period. However, this is in conflict with petitioner's income tax returns for 1943, 1944 and 1945. Petitioner took depreciation on the returns for these years for 6 mules, listed as having been acquired in 1942, and 3 additional mules acquired in 1944. We are unable to reconcile the testimony with these income tax returns. Since it appears unlikely that petitioner would have failed to take depreciation on additional mules if he possessed them, we must assume that the depreciation schedules on his returns for 1943, 1944, and 1945 reflect the correct dates of acquisition and value of the mules petitioner owned at these dates. However, the record as a whole indicates that petitioner did own some mules at December 31, 1941. We have, therefore, allowed him 4 mules, with a total value of $ 800 at this date. On the basis of his income tax returns, we must assume that he disposed of these 4 mules in 1942, possibly exchanging them for the 6 mules which he acquired during that year. Petitioner contends that he had approximately $ 7,600 in cash on hand on December 31, 1941, part of which he kept in a tin box in his bedroom and the remainder in his pockets. He readily admitted that this was a very rough estimate and, on cross examination, agreed that the correct sum might be $ 3,000 or $ 12,000. No other substantiating evidence was received. Though the statement of net worth makes no allowance for cash on hand at this focal date, we feel that a man in petitioner's position must have had at least $ 500 in cash on hand. He was a used-car trader, and the nature of his business required a certain minimum of available cash. There was evidence of various dealings for cash, such as his exchange of his new tractor for a used one, during 1941, at which time he received boot of $ 700 in cash. Although this allowance is based on a rough estimate, the record indicates that it is, nevertheless, justified. A new Ford car was sold petitioner and Robert L. Archer on November 12, 1941, by the Drake Motor Company, for $ 1,070. In the absence of any evidence as to petitioner's specific interest in this car, or whether he still retained any interest in this car on December 31, 1941, it cannot be included among his assets at that date. Moreover, petitioner testified that he owned no personal car during the years in issue but used various cars which were part of his stock in trade. Though the determination of a taxpayer's living and personal expenses for the purposes of a net-worth calculation is of necessity an estimate, it must be reasonable and based on the particular circumstances of the taxpayer's way of life. The evidence in the instant case indicates that the petitioners lived a very frugal existence and we have, therefore, reduced the amounts used in the net-worth computation to $ 2,000 per annum. This sum makes provision for the fines which petitioner paid due to his illegal whisky activities and premiums paid on life insurance policies. Respondent contends that petitioners' net worth at December 31, 1941, should not be increased by the addition of assets which the petitioners did not report on their "White Taxpayer's Returns of Property for Taxation" for 1942. Since the petitioners filed no returns disclosing their real and personal property as of January 1, 1942, the Board of Equalizers for Carroll County, Georgia, filed duplicates of each of the petitioners' 1941 returns. These 1941 returns valued their combined personal property at $ 875. That we should not be bound by either the report which the petitioners filed for 1941 or that which was filed for them for 1942 is indicated by the fact that respondent himself valued petitioners' personal effects alone at $ 3,000 as at December 31, 1941. Moreover, the failure to file a statement of one's assets, or the understatement of such assets to county taxing authorities, cannot preclude our admission and use of reliable oral and documentary evidence relative to such assets. Despite the many changes which we have made in petitioner's favor in the net-worth computations, we have found that his income was still substantially understated in each of the years in issue. Thus, he reported but 80, 7, 8, and 9 per cent of his income in 1942, 1943, 1944, and 1945, respectively. We need not here determine the sources of petitioner's income, nor do we attempt to do so. Petitioner was engaged in a variety of activities, and his unreported income may have been derived from any of those previously mentioned or from activities which have not been brought to our attention. A diligent effort has been made by the respondent to determine the correct income of the petitioners, and we are satisfied that the corrected net-worth statement represents a reasonable approximation of petitioners' income for the years in issue. We must now determine whether these understatements of income and the resulting deficiencies in tax are due to fraud with intent to evade the payment of taxes, thus subjecting the petitioners to 50 per cent penalties for fraud. [1] The statute of limitations has run as to 1942 and 1943, and deficiencies can no longer be collected for these years unless it is determined that they are due to fraudulent intent. *300 We believe that the respondent has sustained his burden of proving that part of the deficiencies for 1942, 1943, 1944, and 1945 are due to fraud. He has proved to our satisfaction, without use of the net-worth statement, the failure of the petitioner to report specific items of income in each of the years involved. Unquestionably, these specific items are small in relation to the total deficiencies arrived at by the net-worth computations. But petitioner's failure to keep records has prevented respondent from determining the exact amount of petitioner's income from each of his various activities. As to the issue of petitioners' fraudulent intent, this is a question of fact to be decided from all the relevant circumstances. Petitioner may have been lacking in formal education and untutored in the intricacies of detailed *301 books and records, but he was a successful businessman, respected in the community for his business acumen. In the preparation of the returns here in issue, he was diligent in itemizing and taking deductions for interest expense, depreciation, medical expense, contributions, taxes, and bad debts. However, in reporting his income, he was deliberately evasive. No attempt was made to compute the cost of goods sold during 1942, 1943, and 1944; to report rental income from various properties in 1943, 1944, and 1945; to report interest income on the extensive financing which he was engaged in during 1942 to 1945; or income from bootlegging during 1942, 1943, and 1944. Nor did his reported gross receipts of $ 22,560 for 1945 bear any reasonable relation to his bank deposits of $ 122,512.85 during that year. Petitioner's explanation is that he made all purchases for Carrollton Auto Parts Company from his personal funds during 1945 because they were lacking the necessary working capital. He contends that a substantial portion of these deposits represents repayments by Carrollton Auto Parts Company for advances he had made on their behalf. However, no return of partnership income was ever filed *302 by Carrollton Auto Parts Company. Petitioner never reported any distributive share of such income even though he indicated at the hearing that a profit was earned and retained in the business. We cannot believe that all this was due to inadvertence or negligence. The understatements of income, as shown by the networth schedules, are too substantial to permit us to believe that petitioner's annual estimates of his income were honest ones. The entire pattern of reporting his deductions in detail, while giving only a lump-sum estimate of his income from most of his various activities, leads us to the conclusion that this was done with the intent to knowingly and fraudulently conceal a substantial portion of his income. The understatements of income over four successive years were so large and consistent that they cannot be attributed to inadvertence or ignorance, but must be considered strong evidence of a fraudulent purpose to evade the payment of taxes. Rogers v. Commissioner, 111 Fed. (2d) 987 (C.A. 6, 1940). Certain of our findings of fact are based on evidence, admitted by way of deposition, to which respondent has objected. These objections, after careful consideration, *303 are overruled. The remaining issue concerns respondent's assessment of a 6 per cent penalty under section 294 (d) (2) for substantial underestimate of petitioners' 1945 estimated tax. Petitioners took credit on their 1945 income tax return for payments of $ 108 on their 1945 Declaration of Estimated Tax. Our findings as to their 1945 income shows this $ 108 estimate to be but a small fraction of their actual income tax liability for that year; and the respondent's assessment of a 6 per cent penalty must, therefore, be sustained. Decisions will be entered under Rule 50. Footnotes
1. SEC. 293. ADDITIONS TO THE TAX IN CASE OF DEFICIENCY. (b) Fraud. - If any part of any deficiency is due to fraud with intent to evade tax, then 50 per centum of the total amount of the deficiency (in addition to such deficiency) shall be so assessed, collected, and paid, in lieu of the 50 per centum addition to the tax provided in section 3612 (d) (2).↩